IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

VALERO MARKETING AND SUPPLY )
COMPANY and THE PREMCOR REFINING )
GROUP, INC., )
　 )
Plaintiffs, )　　　　Case No. 3:06-cv-623-DGW
　 )
v. )
　 )
SOUTHCAP PIPE LINE COMPANY, )
　 )
Defendant.

## MEMORANDUM AND ORDER FOLLOWING BENCH TRIAL

**Wilkerson, Magistrate Judge,**

### BACKGROUND

Plaintiffs Valero Marketing and Supply and Premcor Refining Group filed this lawsuit in August 2006, alleging that Defendant Southcap Pipe Line Company improperly removed 418,357 barrels of crude oil from Plaintiffs' inventory on Southcap's space on the Capline pipeline system.

This matter now comes before the Court after submission of the evidence at a six-day bench trial, which began on October 26, 2009. After the Court's partial grant of summary judgment in favor of Defendant (Doc. 135), four counts of Plaintiffs' complaint remained for trial. After the close of evidence, Plaintiffs filed a motion to amend the complaint to conform to the evidence adduced at trial (Doc. 182), which the Court granted (Doc. 196). After that amendment, four counts of the complaint remain before the Court:

Count I:　　Liability for loss of the oil under the Interstate Commerce Act ("ICA");

Count II:　　Liability for violation of Southcap's tariff;

Count III:　　Unjust discrimination and preference, in violation of the ICA; and

Count VI:　　Declaratory Judgment in favor of Plaintiffs.

Based upon the testimony and exhibits submitted at trial, the Court finds in favor of Defendant Southcap on all counts.  Pursuant to Fed. R. Civ. P. 52(a), the Court makes the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

*Parties*

1.      Defendant Southcap Pipeline Company ("Southcap"), an interstate common carrier, is one of five joint owners of the Capline crude oil pipeline system which runs from St. James, Louisiana, to Patoka, Illinois.  Southcap's ownership in the pipeline entitles it to use approximately 21% of the pipeline's capacity (Doc. 151, Stipulated Facts 1, 7).

2.      Southcap generates revenue by transporting crude oil on its space in the Capline pipeline system.  Southcap does not buy, sell, trade, or refine crude oil (Dennis Ramsey Trial Transcript, pp. 240-41).

3.      Southcap operates under a tariff on file with the Federal Energy Regulatory Commission ("FERC") (Doc. 151, Stipulated Fact 1).

4.      Plaintiff Valero Marketing and Supply Company ("Valero") is the crude oil supply and petroleum marketing division of Valero Energy Corporation, a publically traded petroleum refining and marketing company.  Valero Energy Corporation acquired Premcor, Inc. on September 1, 2005. That acquisition made Plaintiff Premcor Refining Group ("Premcor") a wholly-owned subsidiary of Valero Energy Corporation (Doc. 151, Stipulated Fact 3).

5.      Since the September 1, 2005, acquisition, Southcap has dealt with Valero Marketing and Supply as the successor to Premcor Refining Group (Pl. Exhs. 340, 352).

6.      Plaintiff Premcor, the shipper, contracted with Defendant Southcap, the carrier, to ship crude

2

oil on Southcap's space in the Capline system during the period relevant to this action (Doc. 151, Stipulated Fact 4).

7.    After it acquired Premcor, Valero assumed control over Premcor's inventory-related activities, including crude oil movement (Doc. 151, Stipulated Fact 6).

*Capline Pipeline System*

8.    The Capline pipeline system is jointly owned by five common carrier pipeline companies: Southcap, Marathon Pipe Line LLC, Amoco Pipeline Company, BP Oil Pipeline Company, and Plains All American Pipeline L.P. (Doc. 151, Stipulated Fact 8).

9.    By contractual arrangement, Capline is operated by Shell Pipeline Company ("Shell"). Shell manages the receipt, transportation, and delivery of all the crude oil shipped on Capline. Shell maintains records that document the movement of all oil in the Capline pipeline system (Doc. 151, Stipulated Facts 9-10).

10.   Crude oil is shipped on Capline in either "common stream" or "segregated" batches. A common stream batch, which is oil of like quality, is usually owned by more than one shipper. Any of the shipper/owners can take delivery of oil in a common stream batch (Doc. 151, Stipulated Facts 11-12).

11.   Crude oil may enter Capline at either St. James, Louisiana, or Liberty, Mississippi (Doc. 151, Stipulated Fact 13).

12.   Crude oil arrives at St. James via either connecting common carrier pipelines or tankers at the St. James docks. At Liberty, crude is received by connecting common carrier pipelines (Doc. 151, Stipulated Facts 14-15).

13.   Oil exits Capline at connecting pipelines at Collierville, Mississippi, or Patoka, Illinois (Doc.

151, Stipulated Fact 16).

14.   There is no long-term storage in the Capline system; oil is constantly moving (Ramsey Tr. Trans., pp. 228, 313-14; Joint Exhibit L, Barker Deposition, pp. 73-74).

15.   Batches of crude are shipped back-to-back.  As a result, some interfacial mixing occurs at the head and tail end of a batch of crude oil.  Such mixing occurs normally on a pipeline system, but it is not so significant that entire batches are degraded (Ramsey Tr. Trans., pp. 466-467).

*Nomination Process*

16.   A shipper provides written notice to a Capline carrier that it intends to ship crude oil on the shipper's space by filing a nomination, which includes the date, locations, volume, and destination for delivery (Doc. 151, Stipulated Fact 17).

17.   Southcap's tariff requires that each nomination identify "in writing the Crude Petroleum type, quality, quantity, and final destination point" (Doc. 151, Stipulated Fact 18).

18.   Southcap must approve each nomination before the oil is shipped.  After approval, Shell schedules the shipment.  Nominations are also filed with any connecting carriers (Doc. 151, Stipulated Facts 19-20).

*Oil Movement Documentation*

19.   When crude oil enters the pipeline at the St. James or Liberty points of entry, it passes through a "custody transfer meter."  That meter generates a "custody transfer meter ticket." The oil passes through another custody transfer meter at Collierville or Patoka and another ticket is generated (Doc. 151, Stipulated Facts 21-22).

20.   The custody transfer meter ticket contains a batch number, date and time of receipt or

delivery, location, method of entry, location of exit, directions for delivery, the identity of the person operating the meter, and the oil type, quality, and quantity (Doc. 151, Stipulated Fact 23).

21.    Shell maintains the custody transfer meter tickets and uses them to create a split-ticket number that Shell assigns to each crude oil shipment entering Capline. Shell uses these split-ticket numbers to create monthly Pipeline Carrier Reports, Connecting Carrier Reports, and a Monthly Report (also called an "Oil Volume Statement") for each carrier (Doc. 151, Stipulated Fact 26).

22.    A Pipeline Carrier Report shows the volume and type of crude organized by shipper on a given carrier's space for each month (Doc. 151, Stipulated Fact 27).

23.    A Connecting Carrier Report shows the volume and crude type, by shipper, received by or from Capline for each month (Doc. 151, Stipulated Fact 28).

24.    A Monthly Report (also called an "Oil Volume Statement"), created by Shell and sent to the carriers, summarizes all of a carrier's activities for a month, including opening and closing inventories, receipts, and deliveries. Premcor, a shipper, did not regularly receive the Oil Volume Statements sent from Shell to Southcap, except within the context of this litigation (Doc. 151, Stipulated Fact 29).

25.    Oil Volume Statements from January 1998 through December 2005 appear in the trial record (Pl. Exhs. 136-231; Def. Exhs. 1486-1491).

26.    Based on the Pipeline Carrier Report, Connecting Carrier Report, and Oil Volume Statement, provided by Shell, Southcap prepares a monthly Statement of Oil Account ("Monthly Statement") for each of its shippers (Doc. 151, Stipulated Fact 32).

27.     Southcap prepares invoices for transportation services based on the Monthly Statements (Doc. 151, Stipulated Fact 33).

28.     Each Monthly Statement reports a shipper's opening and closing inventories, receipts and deliveries during the month, any accounting adjustments, and the shipper's line fill requirement.  Southcap issued the Monthly Statements to Premcor until it was acquired by Valero in 2005.  After the acquisition, Southcap sent the statements to Valero (Doc. 151, Stipulated Fact 34).

29.     On a monthly basis, Shell compares the total book inventory on Capline to the total physical inventory and resolves any differences that arise (Doc. 151, Stipulated Fact 30).

***Changes to Capline Oil Volume Statements***

30.     Prior to June 2004, Shell created manually its Oil Volume Statements in an Excel spreadsheet based upon data recorded in a software database called Energy Xchange (Doc. 151, Stipulated Fact 39).

31.     The manual Oil Volume Statements did not report import crude inventory by crude type; all import crude types were reported together by "bucket" (Doc. 151, Stipulated Fact 40).

32.     Shell later configured the Energy Xchange software to automatically generate a monthly Oil Volume Statement, which reported import crude inventory on Capline by specific crude type (Doc. 151, Stipulated Fact 41).

33.     Shell asked the carriers to report their book inventories by crude type.  Shell used the data provided by the carriers to create "unofficial" automated monthly Oil Volume Statements that reported opening and closing crude inventories, receipts, and deliveries, by crude type (Doc. 151, Stipulated Fact 42).

6

34.     For several months, Shell created the monthly Oil Volume Statements manually and generated an automated statement from the Energy Xchange software (Doc. 151, Stipulated Fact 43).

35.     At an unspecified time in 2004, the automated statement replaced the manual statement as Capline's official Oil Volume Statement (Doc. 151, Stipulated Fact 44).

36.     During the period when both statements were generated, the manual statement (which did not report import crude by type) was the official statement (Doc. 151, Stipulated Fact 45).

*December 2002 Book Inventory Adjustment*

37.     At the end of November 2002, Premcor's total book inventory on Southcap was a negative 309,312.80 barrels; its line fill requirement was 462,469 barrels (Doc. 151, Stipulated Facts 35-36).

38.     A negative inventory can occur when a shipper takes more oil out of the pipeline system than it puts into the pipeline system (Ramsey Tr. Trans., pp. 449-50; Dominic Tr. Trans, pp. 55-56).

39.     To remedy a negative inventory, a shipper would have to physically deliver additional barrels into a carrier's space on the pipeline, transfer barrels from another carrier's space on the pipeline, or the shipper and carrier would have to agree to accounting adjustments to change the book inventory (Jt. Exh. L, Barker Depo., pp. 77-80).

40.     To remedy the negative inventory and meet the line fill requirement at the end of November 2002, Premcor would have to either deliver 771,781 total barrels into Southcap's space on Capline or make accounting adjustments to transfer barrels on Capline to Southcap from another carrier's space (Jt. Exh. 301; Jt. Exh. F, Steve Krahenbuhl Depo., pp. 168-69).

7

41.    Premcor did not agree with Southcap's November 2002 statement of negative inventory. Premcor believed that Southcap failed to credit Premcor for barrels to which it was entitled (Jt. Exh. F, Krahenbuhl Depo., pp. 172; Jt. Exhs. 12 and 21).

42.    After advising Southcap of its belief that barrels had not been properly credited to Premcor, Steve Krahenbuhl from Southcap worked with Bryan Barker of Premcor to determine accurate inventory balances (Jt. Exhs. 12 and 21; Pl. Exh. 22).

43.    Premcor asked Southcap to credit some 490,000 barrels of crude to its account (Doc. 151, Stipulated Fact 37; Jt. Exh. 21; Def. Exh. 1208; Jt. Exh. F, Krahenbuhl Depo., pp. 172-73; Jt. Exh. C, Criss Doss Depo., pp. 71-72; Jt. Exh. A, Doss Depo., pp. 12-13).

44.    In December 2002, Defendant Southcap conditionally added 432,775.82 barrels of Qua Iboe crude oil to the book inventory for Premcor (Joint Exhibits 301, 302).[1]

45.    The November 2002 Monthly Statement reported Premcor's closing inventory of Qua Iboe at 4,281 barrels (Jt. Exh. 301).

46.    After the adjustment, the December 2002 Monthly Statement reported Premcor's opening inventory of Qua Iboe as 437,056.82 barrels (Jt. Exh. 302).

47.    Southcap agreed to credit the 432,775.82 barrels in December 2002 with the understanding that Premcor would not take delivery of the barrels until the adjustment was proven accurate and verified by Capline's records (Def. Exhs. 1098, 1099).

48.    The conditions of the adjustment were spelled out in e-mails between Steve Krahenbuhl (Southcap), John Millar (Southcap) and Bryan Barker (Premcor).  On January 9, 2003, John

_____

[1]With the December 2002 statement, Southcap also made adjustments to Premcor's inventory of crude types LLS, Cabinda, and Cusiana (Jt. Exhs. 301 and 302).

Millar wrote to Steve Krahenbuhl: "you can make the changes to Premcor's account in December, but explain that you may not allow them to take delivery of all that inventory in January until we get agreement with Capline" (Def. Exh. 1098).  Krahenbuhl forwarded this e-mail to Bryan Barker (Def. Exh. 1098).

49.    Later that day, Steve Krahenbuhl sent an e-mail to Bryan Barker and carbon copied John Millar and Criss Doss (Def. Exh. 1099).  Krahenbuhl wrote: "Based upon the OK to from John Millar's response, *with the caveat that we reserve the right to make revisions when and if Capline sends us any at any time*, I do plan to adjust Premcor's December opening inventory." (Def. Exh. 1099, emphasis added.)

50.    Bryan Barker testified in deposition that he knew the December 2002 adjustment was conditional (Jt Exh L, Barker Depo., p. 230).

### *Southcap's October 2002 Roll-Forward Analysis*

51.    The amount of barrels credited to Premcor on the December 2002 statement was derived from a "roll-forward" inventory analysis performed by Steve Krahenbuhl in October 2002.  Krahenbuhl reviewed receipts and deliveries dating from February 1999 (Pl. Exh. 30; Def. Exh. 1099).

52.    Krahenbuhl testified in deposition that the beginning inventories he used in his analysis were not verified because at that time Southcap reported inventories of foreign crude in an "import bucket."  The inventories were not crude-type specific (Jt. Exh. F, Krahenbuhl Depo., pp. 123-24).

53.    Krahenbuhl's analysis was based on records provided by Oil Distribution Service ("ODS"), which documents trading of oil among companies.  The analysis was not based on Capline's

meter ticket or oil movement data (Jt. Exh. E, Dennis Hegemier Depo., pp. 230-31).

54.  Mr. Krahenbuhl's roll-forward analysis began with an unsupported February 1999 beginning balance for Qua Iboe crude.  As such, the analysis is unreliable and cannot be used as accounting evidence to support Premcor's assertion that it is entitled to the 418,357 barrels of Qua Iboe removed from its book inventory in December 2005 (Def. Exh. 1248, Innes Expert Report, p. 8).

55.  The December 2002 adjustment by Southcap caused Southcap and Capline's inventory numbers to go out of balance by approximately 400,000 barrels (Jt. Exh. C, Doss Depo., p. 89).

56.  Steve Krahenbuhl testified that at no point in 2002 were Southcap, Capline, and Premcor's inventory numbers in agreement (Jt. Exh. F, Krahenbuhl Depo., p. 125).

***May 2003 Brent Shipment***

57.  In May 2003, Premcor delivered to Capline 418,357.32 barrels of Brent, a foreign sweet crude, for shipping on Southcap's space (Doc. 151, Stipulated Fact 46).

58.  A portion of the Brent shipment was delivered to Premcor in May 2003; the rest was delivered in June 2003 (Doc. 151, Stipulated Fact 47).

59.  Shell did not record the Brent shipment on its official May 2003 manual Oil Volume Statement for Southcap (Doc. 151, Stipulated Fact 48).

60.  Southcap did not credit the Brent shipment to Premcor until their June 2003 Monthly Statement (Doc. 151, Stipulated Fact 50).

61.  In April 2004, Steve Krahenbuhl at Southcap informed Dennis Hegemier at Shell that the Brent Receipt was never recorded by Shell (Jt. Exh. E., Hegemier Depo., p. 57).

62.     Dennis Hegemier investigated Capline source documents and determined that Shell did not account for the Brent shipment in the May 2003 Oil Volume Statement for Southcap (Jt. Exh. E, Hegemier Depo., pp. 58-59).

63.     Having determined that the Brent receipt was never recorded, Shell added 418,357.32 barrels of Brent crude to Southcap's book inventory to accurately reflect the May/June 2003 Brent shipment (Jt. Exh. E, Hegemier Depo., p. 60).

64.     Shell later issued a revised official May 2003 Oil Volume Statement that showed the receipt of the Brent shipment (as import crude) in May 2003 (Doc. 151, Stipulated Fact 49).

65.     After Shell recorded the Brent receipt, Capline's total crude inventory went out of balance. Shell determined, therefore, it could not add the Brent shipment to Southcap's inventory without making an offsetting accounting adjustment elsewhere to Southcap's book inventory (Jt. Exh. E, Hegemier Depo., pp 58-59; Ramsey Tr. Trans., pp. 276-78).

66.     Dennis Hegemier then investigated the imbalance and determined that Southcap's Qua Iboe inventory was overstated by approximately 418,000 barrels (Jt. Exh. E, Hegemier Depo., p. 61).

67.     Dennis Hegemier at Shell communicated with Steve Krahenbuhl at Southcap to determine the accuracy of the overstatement of Qua Iboe, but Krahenbuhl was unable to provide documentation supporting the carrying of that inventory on Southcap's or Capline's books (Jt. Exh. E, Hegemier Depo., p. 70).

68.     Shell investigated further, and determined that the Qua Iboe volume reported on Southcap's books was never physically in the pipe line system.  Shell further determined, based on the source documents, that no Qua Iboe had been delivered to Capline that was not delivered out

11

(Ramsey Tr. Trans., pp. 279-82).

69.     To make the books balance, Capline and Southcap reduced Southcap's Qua Iboe balance by 418,357.32 barrels on its June 2004 Oil Volume Statement (Jt. Exh. E, Hegemier Depo., p. 71; Ramsey Tr. Trans., pp. 283-86; Def. Exh. 1015).

70.     Defendant's expert, Philip J. Innes, reviewed Shell's accounting records and found that Shell's failure to record the Brent receipt in May and June 2003 did not cause an obvious total inventory imbalance because the overstatement of Qua Iboe from the December 2002 adjustment roughly offset the missing Brent receipt (Def. Exh.1250, Innes 2d Supp.Rpt., p. 11).

71.     When Shell recorded the Brent receipt, the books, which were previously in balance as to total volume, went out of balance by the amount of the Brent receipt.  Mr. Innes surmised that the Qua Iboe overstatement would have been discovered earlier by Capline had the overstatement not been "masked" by the understatement of the Brent (Def. Exh. 1250, Innes 2d Supp. Rpt., p. 11).

72.     After the Brent receipt was properly recorded, the overstatement of the Qua Iboe became evident.  The resulting Qua Iboe adjustment was necessary to keep the books in balance (Def. Exh. 1250, Innes 2d Supp. Rpt., p. 12).

73.     Between December 2003 and April 2004 Shell reported a negative balance of 408,874.45 barrels of Brent and a balance of between 438,946.43 and 437,820.91 barrels of Qua Iboe (Def. Exh. 1248, Innes Rpt., p. 16).

74.     No physical barrels were found on the system during the physical count of either Brent or Qua Iboe (Def. Exh. 1248, Innes Rpt., p. 16).

75.    Table 1 - Shell's Book and Physical Inventories:

| Month End | Brent (bbls) | | Qua Iboe (bbls) | |
|---|---|---|---|---|
| | *Shell Reported* | *Shell Physical Count* | *Shell Reported* | *Shell Physical Count* |
| December 2003 | (408,874.45) | 0 | 438,946.43 | 0 |
| January 2004 | (408,874.45) | 0 | 438,946.43 | 0 |
| February 2004 | (408,874.45) | 0 | 437,820.91 | 0 |
| March 2004 | (408,874.45) | 0 | 437,820.91 | 0 |
| April 2004 | (408,874.45) | 0 | 437.820.91 | 0 |

(Def. Exh. 1248, Innes Rpt., p. 16).

76.    The understatement of Brent roughly equaled the overstatement of Qua Iboe (Def. Exh.
       1250, Innes 2d Supp. Rpt., p. 11).

***2004 Book-to-Physical Reconciliation***

77.    In 2003, Capline's owners requested that Capline's crude book inventory be reconciled to
       the crude oil physically present on the system by crude type (Doc. 151, Stipulated Fact 51).

78.    No such reconciliation had been performed since 1996 (Ramsey Tr. Trans., p. 340).

79.    To achieve that book-to-physical reconciliation, the Capline owners created an "Oil
       Movement Committee" to conduct the reconciliation (Doc. 151, Stipulated Fact 52).

80.    The Committee consisted of representatives of each owner (or carrier) and Shell, the Capline
       operator (Doc. 151, Stipulated Fact 53).

81.    Shell reconciled Capline's total book inventory with the physical quantity of crude oil
       existing on Capline (Doc. 151, Stipulated Fact 54).

82.    In April 2004, the total volume of crude oil reported on Capline's official book inventory

matched the total physical volume of crude (Doc. 151, Stipulated Fact 55).

83.   There were, however, imbalances by crude type (Doc. 151, Stipulated Fact 56).

84.   In mid-2004, Shell reviewed shipper-level data for all of Premcor's shipments in Capline and concluded that "all crude oil that was received into the system or that PRG delivered into the system was moved through and delivered to them at their direction" (Ramsey Tr. Trans., p. 257).

85.   Shell's review of the source documents (which included custody transfer meter tickets, split tickets, Pipeline Carrier Reports, Connecting Carrier Reports, and Oil Volume Statements) showed that the disputed barrels were never delivered and never existed in the Capline system (Ramsey Tr. Trans., pp. 263-64).

### *2004 Regrades*

86.   In the fall of 2004, Southcap notified Premcor that it was "regrading" its inventory balances to reconcile them with Shell's 2004 book-to-physical reconciliation (Doc. 151, Stipulated Fact 59).

87.   A regrade is a reallocation of crude volume by crude type to the book inventory to reflect the inventory physically present in the system (Doc. 151, Stipulated Fact 59).

88.   Southcap's tariff provides that "[a]ll such Crude Petroleum will be accepted for transportation only on condition that it shall be subject to such changes in gravity or quality while in transit as may result from the mixture of said Crude Petroleum with other Crude Petroleum in the pipelines or tanks of this, or the connecting carrier" (Doc. 151, Stipulated Fact 58).

89.   The regrades were reflected on the September 2004 Monthly Statement from Southcap to

Premcor (Doc. 151, Stipulated Fact 59).

90.    Among the regrades, Southcap reduced Premcor's inventory of Qua Iboe from 437,821.27 to 418,357.27 barrels, a 19,464 barrel reduction.  The 19,464 barrels were then recategorized as other types of crude on the September 2004 Monthly Statement (Doc. 151, Stipulated Fact 59).

91.    The 418,357.27 barrel inventory of Qua Iboe remained on Monthly Statements issued by Southcap to Premcor from September 2004 to November 2005 (Doc. 151, Stipulated Fact 60).

*Acquisition by Valero*

92.    At the time of Valero's acquisition of Premcor in September 2005, Valero "wrote off" the 418,357 barrels of Qua Iboe in its acquisition accounting (Innes Tr. Trans., pp. 573-576).

93.    In December 2005, Southcap notified Valero (which had since acquired Premcor) by letter that it would remove the 418,357.27 barrels of Qua Iboe from its book inventory (Doc. 151, Stipulated Fact 61).

94.    Valero disagreed with the removal of the barrels and filed suit (Doc. 151, Stipulated Fact 62).

95.    In August 2006, Valero nominated 418,357 barrels of Qua Iboe for delivery.  Southcap declined Valero's nomination (Doc. 151, Stipulated Fact 63).

CONCLUSIONS OF LAW

*Counts I and VI - Violation of the Interstate Commerce Act*

96.    The Interstate Commerce Act ("ICA") governs interstate carriage of oil in pipelines. *See*

*generally*, 18 C.F.R. § 341.0 et seq.[2]  Under the Carmack Amendment to the ICA, carriers are liable for loss, damage, or injury to property they transport.

97.    To state a *prima facie* case in an action to recover damages for such loss, a plaintiff must demonstrate "delivery in good condition, arrival in damaged condition, and the amount of damages." *Missouri Pac. R.R. Co. v. Elmore and Stahl*, 377 U.S. 134, 137-138 (1964); *see also REI Transport, Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 699 (7th Cir. 2008).

98.    A plaintiff may establish its *prima facie* case by either direct or circumstantial evidence. *Allied Tube & Conduit Corp. v. Southern Pac. Transp. Co.*, 211 F.3d 367, 371 (7th Cir. 2000).

99.    If a plaintiff establishes its *prima facie* case, the burden shifts to the defendant "to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *REI Transport, Inc.*, 519 F.3d at 699 (quoting *Am. Nat'l Fire Ins. Co. v. Yellow Freight Sys.*, 325 F.3d 924, 929 (7th Cir. 2003)).[3]

100.    Plaintiffs did not establish a *prima facie* case under the ICA in that they failed to demonstrate the first element of their claim, namely, they did not show delivery of the oil in question.

---

[2]Although the ICA was repealed in 1978, and authority for regulation of transportation of oil was transferred from the Interstate Commerce Commission to FERC, Congress provided that the 1977 provisions of the ICA would continue to govern FERC's regulation of oil pipelines. *See ExxonMobil Oil Corp. v. FERC*,  487 F.3d 945, 956 (D.C. Cir. 2007).

[3]A carrier is exempt from liability where the damage was caused by (a) an act of God; (b) the public enemy; (c) an act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods. *Elmore and Stahl*, 377 U.S. at 137.

101.    Plaintiffs suggested they could not prove a single 418,357 barrel delivery of Qua Iboe.  The Court finds that proof of such delivery is not necessary.  Plaintiffs may establish their *prima facie* case by demonstrating an entitlement to the 418,357 barrels of crude carried on the book inventory beginning in December 2002.

102.    Plaintiffs, however, did not prove that they were entitled to the 418,357 barrels of crude that Southcap removed from their book inventory in 2005.

### December 2002 Conditional Adjustment

103.    The Court finds that the December 2002 adjustment by Southcap to Premcor's inventory statement adding 432,775.82 barrels of Qua Iboe was conditioned upon Premcor providing Southcap with documentation to show entitlement to the barrels.

104.    The individuals involved in that adjustment–Premcor accountant Bryan Barker, Southcap scheduler Steve Krahenbuhl, and Southcap Vice President John Millar–all testified that the adjustment was conditional upon Premcor providing Southcap with documentation showing the adjustment was appropriate.

105.    Furthermore, e-mails written in December 2002 and January 2003 that were produced at trial specify that the nature of the adjustment was conditional, and Premcor would not be able to take delivery of the barrels added to their book inventory until they had provided Southcap with proof of their entitlement to the barrels.

106.    Southcap could not support with documentation the existence of the barrels to Capline during the 2004 book-to-physical reconciliation.

107.    Valero "wrote off" the barrels in their acquisition accounting in September 2005.

108.    Premcor was unable to demonstrate entitlement to the barrels at the time they were removed

from the book inventory in December 2005.

109.    Premcor did not prove at trial an entitlement to the barrels.

### The Brent Receipt

110.    Southcap's and Premcor's unsupported addition of the 432,775.82 barrels to their book inventories in December 2002 was not immediately obvious on Capline's books.

111.    The overstatement was masked by Shell's failure to record Premcor's May and June 2003 receipt of Brent crude of roughly the same amount of the Qua Iboe overstatement.

112.    After Shell properly recorded the Brent receipt, Shell's books, which had been in balance as to total crude volume, went out of balance by the amount of the Brent receipt.

113.    Shell's investigation of the imbalance revealed that the December 2002 conditional adjustment of 432,775.82 barrels of Qua Iboe caused the imbalance.

114.    Plaintiffs did not provide the Court with any documentation that the conditional adjustment was based on physical barrels that ever existed in the Capline system.

115.    On the contrary, Defendant demonstrated that Steve Krahenbuhl's roll-forward analysis, upon which the amount of the December 2002 adjustment was based, was invalid because it did not begin with verifiable balances.

116.    Premcor Accountant Bryan Barker admitted in deposition that there was no accounting basis for the addition of the barrels in December 2002.

117.    Defendant's expert witness, Phil Innes, testified that the imbalance between Capline and Southcap's inventories resulted from Southcap's December 2002 conditional adjustment.

118.    Mr. Innes testified that Premcor had no evidence to support the December 2002 conditional adjustment.

18

119.   Furthermore, when Valero purchased Premcor, the Qua Iboe balance was "written off" in the acquisition accounting.

120.   Because Plaintiffs, after attempting to do so for years, were not able to prove a basis for the December 2002 conditional adjustment, they have not met their burden of proving delivery under the ICA.

121.   The Court rejects Plaintiffs' argument that proof of delivery, or their entitlement to the 418,357 barrels of Qua Iboe, was impossible to demonstrate.

122.   In this case, to prove delivery under the ICA, Plaintiffs would have to show the barrels existed and that they were entitled to carry the barrels on their book inventory.

123.   Defendant demonstrated that Plaintiffs received back all the crude oil they delivered into Southcap space on the Capline pipeline.

124.   Defendant also demonstrated that the remaining 19,464 barrels were reallocated as other crude types in the September 2004 Monthly Statement.

125.   The Court rejects Plaintiffs' assertion that Southcap failed to keep accurate records as required by the ICA.

126.   Thus, Plaintiffs have failed to make their *prima facie* case on either Counts I (that removal of the barrels violated the ICA) or VI (declaratory judgment) of the complaint.  The Court finds in favor of Defendant on those counts.

**Count II - Violation of Southcap's Tariff**

127.   Because Plaintiffs have failed to make their *prima facie* case under the ICA, the claim raised in Counts II also fails.

128.   Plaintiffs have not shown that they were entitled to the 418,357 barrels of Qua Iboe removed

from their book inventory.

129.   Southcap's December 2005 removal of 418,357 barrels of Qua Iboe from Premcor's book inventory was appropriate.

130.   Accordingly, the removal of the barrels did not violate Southcap's tariff.

131.   The Court further notes that the tariff itself, although attached to the complaint, was not admitted into evidence at the trial.

132.   Plaintiff did not offer any additional evidence that would support Southcap's violation of the tariff.

133.   The Court finds in favor of Defendant Southcap on Count II of the complaint.

### Count III - Unjust Discrimination or Preference in Violation of the ICA

134.   Because Plaintiffs failed to establish their *prima facie* case that the removal of the 418,357 barrels of Qua Iboe from their book inventory, their claim that Southcap unjustly discriminated against them also fails.

135.   The Plaintiffs did not demonstrate that the removal of the barrels was arbitrary, unjustified, or discriminatory.

136.   Plaintiff has not submitted evidence to support or justify the December 2002 conditional adjustment.

137.   Defendants demonstrated that Southcap's December 2005 removal of the barrels from Premcor's (Valero's) inventory was appropriate.

138.   Thus, the Court finds in favor of Defendant Southcap on Count III of the complaint.

### Damages

139.   Because the Court finds in favor of Defendant on all counts, discussion of the calculation of

20

Plaintiffs' damages is unnecessary.

### CONCLUSION

In light of all the foregoing the Court **FINDS** in favor of the Defendant on Counts I, II, III, and VI.  The Court **DIRECTS** the Clerk of Court to **ENTER JUDGMENT** in favor of Defendant and against Plaintiffs and **CLOSE** the case.

**IT IS SO ORDERED.**

**DATED: September 29, 2010**

s/ *Donald G. Wilkerson*
**DONALD G. WILKERSON**
**United States Magistrate Judge**